**CHICAGO, M., ST. P. & P. R. CO. v. GILBERT.**

No. 8115.

Circuit Court of Appeals, Ninth Circuit.

Jan. 11, 1937.

Murphy & Whitlock and J. C. Garlington, all of Missoula, Mont., R. F. Gaines, of Butte, Mont., and A. N. Whitlock, of Seattle, Wash., for appellant.

T. J. Davis, H. L. Maury, and A. G. Shone, all of Butte, Mont., for appellee.

Before WILBUR, GARRECHT, and DENMAN, Circuit Judges.

WILBUR, Circuit Judge.

The appellee was employed by the appellant to drive a Mack dump truck. He brought this action against his employer, Chicago, Milwaukee, St. Paul & Pacific Railroad Company, to recover for injuries to his right hand upon the ground that the appellant had neglected its duty to use reasonable care to furnish him a safe appliance with which to work and had neglected the duty of inspection of said appliance. The appeal is from the verdict and judgment in his favor.

The principal question involved on appeal is whether or not the trial court should have granted appellant's motion for directed verdict.

The dump truck belonged to the city of Deer Lodge. The appellee's father was road commissioner for the city and had frequently used the truck. Appellee was a skillful driver and mechanic, and had frequently driven the truck during the period of 4 or 5 years prior to the action. The truck had been lent to appellant by the city about 6 days previous to the accident for the purpose of moving débris resulting from a fire which destroyed the machine shops of the appellant company at Deer Lodge, Montana.

The truck was about 20 years old and had probably been used by the government during the World War and had been owned by the city about 12 years. The original design of the Mack trucks of that date was defective, so that the engine invariably overheated. The appellee alleges some fifteen respects in which he claims the truck was defective. One of the defects was overheating. Some of the defects alleged by the appellee related to the dumping apparatus. Such defects, and many others enumerated, had no bearing upon the accident, which, it is alleged in the complaint, resulted from the explosion of the fan.

The truck had been driven by Albert Schurman, who was an experienced driver, during the first 3 days it was used by the appellant. The appellee had been recommended to the appellant as a competent driver and was employed for that reason. While returning from dumping a load he observed that one of the cylinders of the engine was missing, or showing diminished compression, and stopped the truck to ascertain the cause. While the engine was still running at medium speed, that is, something less than five to nine hundred revolutions per minute, the appellee raised the hood of the engine and found that the pet cock on the rear cylinder was open. He took hold of the pet cock valve with the thumb and finger of his right hand in order to close it. He testified that while so engaged his hand was struck by a piece of a fan blade. He testified positively that he did not remove his hand from the pet cock until after his finger was struck by a piece of the fan blade; that he did not place his hand in the path of the revolving fan blades; and that he did not know how the accident occurred. He contends that the breaking of the fan was the result of centrifugal force.

An expert witness was called by the appellee who gave some color to his theory that the breaking of the fan was caused by centrifugal force. This witness, C. L. Stubbs, was an automobile mechanic, a shop foreman in charge of repairs in a shop where four or five hundred automobiles were repaired per month. He testified that he was familiar with automobile fans and that in his work as foreman he had seen the results of fans that had broken and disintegrated. The hypothetical question asked of him was as follows: "Supposing you had a car extremely old, shown to have a wobble in the fan, with worn bearings, that gave forth a loud hum as the fan revolved, and it was shown that the flanges or pieces of that fan had broken off and had flown through the air while the shaft was revolving, and basing your answer on your experience in having cared for all the cars of which you have testified, what, in your opinion, would have caused that fan to break or come apart?"

He answered: "As long as there was no obstruction and your bearing was badly worn, I would say it was an out-of-balance condition. Centrifugal force would tear that fan apart."

It is obvious that the question did not furnish the witness the necessary data for determining whether or not the fan was broken by centrifugal force. In order to answer such a question it would be necessary for the witness to know the force which was exerted upon the metal, and the tensile strength of the metal and its dimensions. The only information given the witness concerning the velocity of the fan was that it was revolving. No information was given as to the material of which the fan was composed or of its dimensions. In answering the question, the witness introduced an assumption which was not contained in the question; that is, that there was no obstruction. He did not state that in his opinion the fan was broken by centrifugal force, but stated an abstraction; namely, that centrifugal force would tear that fan apart. So it would if the velocity were great enough. On cross-examination it was made apparent that the witness was not familiar with the scientific problems involved in determining the centrifugal force or its effect. He merely knew that a fan was more likely to break at high speed than at low speed, and this is a matter of common knowledge.

In considering the cause of the injury to the appellee it is necessary to state the evidence more in detail.

The fan assembly of the truck with a new fan installed, and the fan which was in the truck at the time of the injury complained of, are before this court as exhibits.

The fan is not the familiar screw propeller type. It is placed between the engine and the driver's seat and has nine vanes or blades three-sixteenths of an inch thick set tangent to the circumference of a cylinder 3 inches in diameter whose axis is the center of the axle. The fan is composed of a cast alloy of aluminum consisting almost entirely of aluminum. Two rings of the alloy each about 1¼ inch wide and one-fourth inch thick encircle and bind together the ends of the vanes, like the rim of a wagon wheel. These rings tend to prevent the vanes from breaking either from centrifugal force or air pressure. The fan rotates inside circular radiator coils. The coils are enclosed in an iron frame. The side of the fan toward the engine is open except for two supporting cross-arms, one horizontal and one vertical. The space between the arms and the vanes

of the fan tapers from about 1¼ inch to 1½ inch. The pet cock valve which appellee was closing at the time of injury is about 5 or 6 inches from the side of the fan nearest the engine.

At the time of the accident, appellee was wearing canvas gloves and a metal ring on the third finger of his right hand. After the accident, it was noticed that one of the cross-arms, the right-hand cross-arm looking at the truck from the front, was cracked, and immediately after the injury witnesses observed a mark from a glove finger and light brownish lint on the cracked cross-arm, the lint being the same as the lint which was on the gloves worn by appellee. If a person grasped the cross-arm any place near or on the crack, with his fingers encircling it, they would be caught in the moving vanes of the fan.

Although appellee alleges that the fan "exploded, burst and became disintegrated," the only parts of the fan that were damaged were the vanes. Four semicircular pieces were broken out of the sides of four consecutive vanes of the fan, each about opposite the crack in the cross-arm referred to, from the sides of the vanes nearest the engine. One of the vanes of the fan was broken entirely away and another one was broken almost entirely away, and two other vanes had irregular pieces broken out of them. There was testimony to the effect that one of these latter vanes was broken subsequent to the time of the accident and after the fan was removed from the truck. Sections of the ring about the outside circumference of the broken vanes were broken out.

As to the importance of the nature of the breaks in the vanes as bearing on the question of the cause of the breaks, George Shue, an assistant professor of physics at the Montana School of Mines who is a chemical engineer and master of science with a major in metallurgy, testified that, if a foreign object were thrust in between a cross-arm and the vanes, and the fan were rotating, "this foreign object would cause these breaks because the ring out here (the ring encircling the outside vanes) would still tend to support these vanes and not let them break away back. Four of them show that type of break, and it would appear that they were all broken in that manner. It would be purely speculative as to how the rest of them were broken, because with these pieces freed the others may have been broken by binding on these pieces somewhere within the radiator."

It is evident from the condition of the fan after the accident and from the nature of the breaks in the vanes of the fan that the fan did not disintegrate and explode but that the breakage of the vanes was caused by some obstruction, although, as indicated by the evidence of George Shue and of Edward Sears, mechanic, one or more of the vanes of the fan may have first broken, blocking the fan, causing the breakage to the other vanes.

There is other evidence to the effect that it would have been impossible for the breakage in the fan vanes to have been caused by centrifugal force. The truck had been operated for about 20 years, and the maximum speed of the fan was less than 1,050 revolutions per minute (the engine revolutions were limited to between 600 and 900). There was no evidence that the fan had ever been broken before by centrifugal force. George Shue, the witness referred to. above, testified that the breakage of the vanes of the fan could not have been caused by centrifugal force because the speed of the fan at the time of the accident was not great enough to break the fan. He testified that the fan vanes were composed of a cast alloy of aluminum; that the vanes of the fan were approximately three-sixteenths of an inch in thickness; that the metal of which the fan was composed had a tensile strength of 10,-000 pounds to the square inch; and that it would require a speed of 12,000 revolutions a minute before there would be danger of the metal flying apart. He was cross-examined as to the effect of the overheating of the engine, upon the tensile strength of the fan, particularly with reference to an assumed temperature of 350 degrees centigrade (650 degrees Fahrenheit), although there is no evidence that such high temperature had been attained by the overheating of the engine and none as to the temperature of the fan which moves in cool air. The witness testified that in his opinion the overheating of the engine for a period of over 20 years would have no effect upon the tensile strength of the vanes of the fan which were 5 or 6 inches from the engine.

James O'Neil, a mechanic of 20 years' experience and generally familiar with the

type of Mack truck involved in the case at bar, and who had previously examined the broken vanes, testified that, "in order for the pieces to be broken out of the fan, * * * I would say that the fan would have had to strike something."

Albert Schurman, automobile mechanic of about 10 years' experience, and who had been employed to drive the truck for the first 3 days, immediately following the fire at the shops of the appellant, testified that he had inspected the truck at that time and had found that in general the fan assembly of the truck was in good order aside from some end play, that he had driven the truck after the accident while the vanes of the fan were still broken, and upon inspection at that time found that there was no more end play present than when he had previously examined it. He testified that: "The only way in which I can figure this fan was broken is as the result of some obstruction"; that he believed that "a boy's hand would be a sufficient obstruction to break the vanes of the fan."

We conclude that the evidence of breakage by centrifugal force was not substantial, and therefore insufficient to submit that question to the jury.

However, even if we assume, as appellee contends, that the fan broke by reason of centrifugal force, the question then is whether there is sufficient evidence for the consideration of the jury as to whether or not the appellant, in the exercise of reasonable care in providing the truck for operation by the appellee, should have discovered that the fan was liable to break because of centrifugal force. The appellee does not claim that there was any defect in the metal of the fan which could have been ascertained by inspection. To show negligence in that regard, the appellee relies upon the age of the fan, upon evidence that the engine overheated abnormally, that there was a hum or grind in the fan, that the fan wobbled to some extent by reason of the wear of the bearings, and that the fan belt had frequently broken as indicating to the appellant that its employees were endangered by operating the truck. These defects had all existed for years and were fully known to the appellee who had frequently driven the truck. They were either the results of defective design or the usual wear and tear from long use. Assuming that the defects pointed out by the appellee were obvious or could have been discovered by appellant by a reasonably careful inspection, such defects would not have been sufficient to warn the appellant that the fan was liable to break from centrifugal force. Consequently, there was no showing that would justify the jury in finding that appellant could have ascertained by a reasonably careful inspection that the fan was liable to break from centrifugal force.

The appellee also advanced the theory that the fan became obstructed and broke. The trial court instructed the jury upon that subject as follows: "In this case it appears to me that there are only two theories. The plaintiff says that the fan exploded or became obstructed and broke, and that a piece flew out and cut off one finger and injured the little finger. That is either true or it is not. The defendant's theory appears to me to be that the plaintiff stuck his finger into that revolving fan. Now, you have a choice of one of those two theories."

The allegation of the complaint in that regard is that the fan "upon the engine of said motor dump truck became jammed or obstructed and because of the defective condition herein alleged suddenly and violently, and without warning exploded, burst, and became disintegrated into several pieces."

There is no evidence of any obstruction, other than the inference arising from the fact of breakage. If we assume that the breakage was due to some obstacle or obstruction other than appellee's hand, it is not shown that the obstruction, if any, could have been discovered by a reasonably careful inspection. Such evidence was essential in order to charge the appellant with negligence.

If the evidence had disclosed that the fan had wobbled sufficiently to come into contact with some stationary part of the fan casing, or the engine, and that this condition resulted from the worn bearings or otherwise, there would have been a basis for submitting the case to the jury upon that theory. But appellee did not contend in the lower court, and does not contend here, that there was sufficient wobble or play of the fan to permit it to come into contact with the stationary part of its housing. The evidence is to the contrary. The appellee does not show that there is any defect in the fan or its housing which could have been discovered by inspection other than the obvious wobble or play of the fan.

The appellee had the burden not only of showing that he was injured while operating the truck, but also that the injury resulted from some defective condition which could have been ascertained by the appellant by a reasonably careful inspection. He has not shown that there was any defect in the fan which would have caused it to explode which could have been discovered by any reasonable inspection. He is unable to show that there was any obstruction in the fan casing prior to the time of the accident, and consequently does not show that there was any defect discoverable by a reasonably careful inspection in the engine or housing of the fan that caused the accident.

Appellant's motion for a directed verdict should have been granted.

Reversed.